**253 P.2d 317**

### ARMIJO v. NUCHOLS.

No. 5552.

Supreme Court of New Mexico.

Jan. 30, 1953.

Iden & Johnson, Albuquerque, for appellant.

A. T. Hannett, G. W. Hannett and W. S. Lindamood, Albuquerque, for appellee.

COMPTON, Justice.

This is an action by appellee, plaintiff below, to cancel a contract. On June 5, 1951, the parties entered into a contract for the sale of appellant's ranch in Torrance County to appellee for a consideration of $47,500, payable $17,500 cash, $10,000 and interest on or before November 1, 1951, and the balance payable in annual installments. The ranch consists of fee land, State leases, and land located within the National Forest upon which appellant holds grazing permits for 101 head of cattle.

The complaint, in separate causes of action, charges fraud, failure of consideration, and mutual mistake. The answer denies all material allegations. By counterclaim, appellant seeks judgment for the amount due under the terms of the contract. The trial was before the court which found that due to mutual mistake of material fact, there was a failure of consideration and accordingly rendered judgment decreeing rescission.

Within appellant's ranch one Felipe Sanchez owns a small tract of 160 acres and in connection therewith has a permit from the Forest Service to graze 12 or 14 head of cattle. Appellant's permits and the Sanchez permit constitute a community

allotment for cattle only and under rules and regulations promulgated by the Department of Agriculture relating to the use of the National Forests, when forest lands and private lands are used jointly, the entire area is treated as a unit and the department retains the exclusive authority to determine the number of livestock, whether of cattle or sheep, that may graze thereon. The rules and regulations also provide that community allotments cannot be changed from cattle allotments to sheep allotments without the consent of all parties composing the community allotment, and with the consent of the Forest Service. The parties at the time did not know of the Sanchez permit or of the community allotment, nor were they aware of such departmental rules and regulations.

The substance of the findings was that the ranch was to be used as a sheep ranch; that the parties were laboring under a mutual mistake in the belief that sheep could be run upon the ranch, particularly so, on a ratio of 5 head of sheep to 1 head of cattle; and that upon a transfer of appellant's forest permits, grazing right would not be reduced in excess of 10%, whereas, grazing rights were to be reduced 55%.

The findings are not challenged. Appellant contends, however, that appellee with full knowledge of facts and circumstances entitling him to rescission, ratified the contract. He also asserts that appellee is charged with notice of all rules and regulations of the Department of Agriculture, pertaining to the grazing of the National Forest. The trial court having found adversely to him, appellant is here seeking a review of the judgment.

Appellee took possession of the ranch on June 17, 1951, and immediately placed thereon 2,000 ewes and lambs. On July 26th, or 25th, the discrepancy in dates being immaterial, he went to the office of the grazing supervisor with a view of having the Nuchols permits transferred to him. At the time he was informed by the supervisor "that there was to be a 55% cut on all transfers of forest permit, and that it could not be used for sheep or changed to a sheep allotment without the consent of Sanchez, the other person having an interest in the community allotment; that * * * placing * * * sheep on said allotment was a trespass, and that unless arrangements were made satisfactory to the Forest Service, he would be held in trespass * * *". The supervisor also advised appellee to get in touch with Sanchez and acquire his interest but in any event he would not be permitted to graze more than 230 head of sheep upon the ranch.

At this point, clearly, appellee was entitled to avoid the contract but he did not elect to do so. In the face of the facts just related, subsequently, on July 28, 1951, the parties entered into a supplemental

agreement which they denominate "Amendment to Agreement", relating to the renewal and payment of annual rentals on certain State leases which might expire during the tenure of the original contract. The supplemental agreement reads:

"Amendment to Agreement

"This is an Amendment to that certain agreement made and entered into on the 5th day of June, 1951, between C. R. Nuckols, an unmarried man, therein and herein called Party of the First Part, and David J. Armijo, therein and herein called Party of the Second Part, Witnesseth:

"Whereas, it is now the desire of the parties that the agreement of June 5, 1951, be changed in the following respects and in the following respects only, all other terms of such agreement to remain in full force and effect,

"In and for the consideration of the sum of One Dollar ($1.00) paid by Second Party to First Party, receipt of which is hereby acknowledged, it is understood and agreed that the agreement hereinbefore referred to is hereby amended to read as follows:

"That the First Party at the present time holds a certain state grazing lease from the Commissioner of Public Lands, and the said First Party agrees to renew such lease upon the expiration of said lease, same to be re-

newed in accordance with the rules and regulations of the State Land Office; and said First Party further agrees to keep said lease in good standing for the term of the escrow agreement by paying the notes as they become due on each October 1st. It is understood, however, that Second Party is to reimburse the First Party for all notes paid in connection with such lease. All other terms and conditions of said agreement to remain as written.

"In Witness Whereof, the parties hereunto have set their hands and seals this 28th day of July, 1951."

It is obvious that the supplemental agreement expressly confirms the validity of the original contract. Its effect as we view it was to treat the original contract as in all respects in full force, except as to the handling of State leases, notwithstanding any previous mutual mistake. Equally significant is the fact that on August 10, 1951, the supervisor wrote appellee calling his attention to the fact that he held no permit and unless he concluded negotiations for the Sanchez permit by August 24th following, he would be held in trespass and action would be taken forceably to remove his sheep. Appellee was unable to acquire the Sanchez permit, nevertheless, continued to use the ranch as his own until August 30th thereafter, at which time he called at the office of the super-

visor and was given a special grazing permit for his sheep covering the period July 20th to August 30, 1951. On or about the latter date he moved his sheep from the ranch and notified appellant of his election to rescind. Appellee's conduct is further expressed by his own testimony, we quote:

\* \* \* \* \* \*

"Q. All right, now, Mr. Murray made some suggestion to you about going out and getting the Sanchez—(Interrupted) A. (Interposing) He suggested that I try and buy Mr. Sanchez cattle, that he had only permit for 5 head of cattle and that—(Interrupted)

"Q. (Interposing) Fourteen, wasn't it? A. Sir?

"Q. Fourteen, he had at the time? A. Well he had been cut.

"Q. It would be cut if you got it? A. No, he told me Mr. Sanchez had been cut.

\* \* \* \* \* \*

"Q. Did you immediately run Mr. Nuchols down and tell him you were through with the deal? A. I let Mr. Nuchols know that I was having trouble.

"Q. That was later. I am asking you what did you do on the 20th of July? A. The 20th of July?

"Q. Yes. A. I kept negotiating with Sanchez to see if I could buy his allotment.

"Q. You never got in touch with Mr. Nuchols, according to your testimony, until after you got the letter of August 10th, is that right? A. That is right.

"Q. So, I am asking you, on the 20th, did you make any effort to rescind this contract, or call it off, because as you say, it looked as if you got hooked? A. Well, I thought probably if I could buy this other man out, I could get an allotment for the sheep and probably they give me the full per cent.

\* \* \* \* \* \*

"Q. Now, the reason that you didn't get out on the 20th of July was because you still wanted to use that ranch, didn't you? A. Certainly I wanted to use it.

"Q. And you say you had made up your mind then, you were going to rescind the contract? A. After I knew of the cut.

"Q. On the 20th of July? A. On the 20th of July?

"Q. Yes? A. Well, I was thinking about it.

"Q. But you had to keep your sheep there, didn't you? They would die if you didn't take them off,—if you didn't leave them there? A. I lost plenty there, but that is the only place I had for them.

"Q. But you had to keep them there. You had to have the range, didn't you, on account of the drought?

A. That is right.

"Q. You kept them there and utilized it as long as you needed it, that summer? A. Up to September 1st.

"Q. As long as you figured you needed it, isn't that right? A. That is right."

▌ We conclude that the contract was ratified expressly as well as by conduct. The principle is well established that voidable contracts may be rescinded at the election of an injured party; but, if with full knowledge of facts entitling him to rescission, he ratifies the transaction, he is conclusively bound thereby. This is the conclusion of such outstanding authorities as Williston and Thompson; Pomeroy; Am.Jur.; C.J.S.; and Restatement. We quote from some of the texts:

"The right to rescind a contract may be lost, as where there is a ratification or waiver. The ratification of an invalid agreement may be express or implied. If a party desires to rely upon the invalidity of a contract, he must disclaim it and refuse to permit anything to be done under it in so far as it concerns him. A party to a contract who, after discovery or knowledge of the facts which would entitle him to rescind, treats the con-

tract as a subsisting obligation and leads the other party to believe that the contract is still in effect waives his right to rescind." 12 Am.Jur. (Contracts) Sec. 449.

"Where a party, with knowledge of facts entitling him to rescission of a contract or conveyance, afterward, without fraud or duress, ratifies the same, he has no claim to the relief of cancellation. An express ratification is not required in order thus to defeat his remedy; any acts of recognition of the contract as subsisting or any conduct inconsistent with an intention of avoiding it, have the effect of an election to affirm." 12 C.J.S., Cancellation of Instruments, § 38.

"A voidable contract, however, is common in the law. Such a contract is defined in the Restatement of Contracts as one 'where one or more parties thereto have the power, by a manifestation of election to do so, to avoid the legal relations created by the contract; or by ratification of the contract to extinguish the power of avoidance.'" Williston and Thompson (Contracts) (Rev.Ed.) Vol. 1, Sec. 15.

"While the party entitled to relief may either avoid the transaction or confirm it, he cannot do both; if he adopts a part, he adopts all; he must reject it entirely if he desires to obtain

relief. Any material act done by him, with knowledge of the facts constituting the fraud, or under such circumstances that knowledge must be imputed, which assumes that the transaction is valid, will be a ratification." 3 Pomeroy "Equity Jurisprudence", Sec. 916.

"The power of avoidance for fraud or misrepresentation is lost if the injured party after acquiring knowledge of the fraud or misrepresentation manifests to the other party to the transaction an intention to affirm it, or exercises dominion over things restoration of which is a condition of his power of avoidance, except as stated in Sec. 482." Restatement (Contracts), Sec. 484.

Also see Terry v. Humphreys, 27 N.M. 564, 203 P. 539; Grymes v. Sanders, 93 U. S. 55, 23 L.Ed. 798; Bardwell v. Albertson, 120 Fla. 106, 162 So. 321; Bowman v. Schatzinger, 14 Ohio Cir.Ct.R.,N.S., 513, Id., 81 Ohio St. 565, 91 N.E. 1124.

The judgment will be reversed with directions to the trial court to enter judgment for appellant on his counterclaim, and it is so ordered.

SADLER, C. J., and McGHEE, J., concur.

COORS and LUJAN, JJ., not participating.