282 P.2d 1113

Clarence G. BROWN and Gladys Brown, his wife, Plaintiffs-Appellants,

v.

Caven L. NEWTON and Maurine A. Newton, his wife, Defendants-Appellees.

No. 5784.

Supreme Court of New Mexico.

April 15, 1955.

Rehearing Denied May 11, 1955.

McAtee & Toulouse, Albuquerque, for appellants.

Rodey, Dickason, Sloan, Mims & Akin, Albuquerque, for appellees.

LUJAN, Justice.

This is a suit to cancel and rescind a written contract on the grounds of fraud and misrepresentation. The facts are that on May 18, 1951, the plaintiffs traded to defendants certain real estate located in Albuquerque, New Mexico, for a tourist or fishing camp located in Delaware County, state of Oklahoma. Both properties were incumbered by mortgages which were assumed by the respective parties.

The record shows that during a visit to Neosho, Missouri, early in the month of February, 1951, Clarence G. Brown, one of the plaintiffs, saw an ad in a local newspaper of the town of Joplin, Missouri, advertising certain property for sale. On his return to Albuquerque, New Mexico, and

on February 13, 1951, Mr. Brown wrote a letter to W. L. Snead, a real estate broker in Joplin, Missouri, telling him that he was interested in a farm or fishing camp on a lake or good river and stating that he had a home and income property in Albuquerque which he would trade. Mr Snead did not have that kind of property listed at that time, but later on he heard about the tourist camp from a friend and immediately contacted the Newtons, defendants herein, who wanted to sell their tourist camp. On March 29, 1951, Mr. Snead answered Mr. Brown's letter informing him that he had located something he might be interested in and that the owner of said property was particularly interested in Albuquerque property. He enclosed a description of the Oklahoma property. On April 1, 1951, Mr. Snead called on the Newtons and informed them that he had a prospect for their property. On April 3, 1951, Mr. Snead wrote Mr. Brown giving him more details on the Oklahoma property and requested additional information as to defendants' Albuquerque property. On April 5, 1951, Mr. Brown wrote Mr. Snead giving him detailed information about his property and made further inquiry about the Oklahoma property. On April 9, 1951, the defendants came to Albuquerque, visited the Browns and looked over their property. On April 14, 1951, Mr. Newton wrote Mr. Snead giving him the details of his trip to Albuquerque and indicating the possibility that a trade of the respective properties might be arranged. On April 17, 1951, Mr. Snead forwarded this letter to the Browns. On April 20, 1951, Brown arrived in Bernice, Oklahoma, for an inspection and examination of defendants' property. That evening Mr. Brown discussed with the Newtons the property owned by them. Later that evening Mr. Brown telephoned Mr. Snead at Joplin, Missouri, and asked him to come down to Bernice, Oklahoma, the next day. On April 21, 1951, Mr. Brown personally inspected and examined the property. After completing his inspection and examination he returned to the cabins, at which time Mr. Snead had arrived. Then, Brown, Newton and Snead made an inspection trip around the premises. Upon their return to the cabins all three discussed the feasibility of a trade. And, after having decided to make a trade they entered into a memorandum agreement whereby the Newtons agreed to convey their property to the Browns and the Browns agreed to convey their property to the Newtons. On May 15, 1951, the Newtons left Bernice, Oklahoma for Albuquerque, New Mexico, arriving on May 17, 1951. On the same day the contract of exchange was drawn up by Mr. Cole, Browns' Albuquerque attorney, previously signed on May 12, 1951, by the Browns, was signed by the Newtons. On May 19, 1951, the Newtons took possession of the Albuquerque property and moved therein. On May 20, 1951, the Browns

took possession of the Oklahoma property and moved therein. Thereafter the plaintiffs began to collect and retain the rents derived from the cabins.

On June 22, 1951, Mr. Brown made a payment to the Farmers' State Bank in Afton, Oklahoma, on the mortgage on the Oklahoma property and also discussed with the banker, the possibility of borrowing money to improve the premises. On the same day Mrs. Brown wrote Mrs. Newton and asked her where to make a payment on the washing machine, which had been bought by the Browns from the Newtons as a part of the Oklahoma property. On June 26, 1951, Mr. Snead visited the Browns since he had heard from Mr. Newton that things were not running smoothly, but Mr. Brown informed him that he was satisfied with the deal and that he was going through with it. On July 2, 1951, Mr. Brown called Snead and told him that he was dissatisfied with the deal and asked him to come down to Bernice. He told him the lake was flooding the land and that the water was about to come into the cabins. On July 5, 1951, Mrs. Brown wrote Mr. Snead saying she was trying to work things out so that they could get a title to the Oklahoma property. On July 7, 1951, Mr. Snead drove down to Bernice and found that the Browns had gone away, leaving the premises in charge of one Mr. McCord under an arrangement whereby Mr. McCord, for his services, would keep

one third of what came in from the rent of cabins. On July 9, 1951, the Browns called on the Newtons at Albuquerque and told them that they were going to back out on the deal, mentioning as one reason the existence of the flowage easement. That talk was the first time the flowage easement had been mentioned by the Browns. On August 13, 1951, the Browns instituted this action.

Their complaint, among other things, alleged:

"No. 5. Defendants are unable to convey to plaintiffs the real estate described in paragraph 1 of said contract (Exhibit A), as provided in paragraph 4 thereof 'free and clear of all liens and encumbrances, except the mortgage above mentioned,' for the reasons that:

"(a) The United States of America has a perpetual easement for flowage purposes over a portion of said lands, which easement is more particularly described in a judgment entered in cause no. 1178 in the United States District Court for the northern district of Oklahoma.

"(b) The United States of America has a perpetual easement for flowage purposes over a portion of said lands, which easement is more particularly described in a judgment entered in cause no. 1076 in the United States

District Court for the Northern District of Oklahoma.

"(c) A portion of the said lands is owned in fee simple by the Grand River Dam Authority, a public corporation, as set forth in a warranty deed, dated January 20, 1939, from Thomas J. Foust and wife.

"(d) There appears of record against said lands a mortgage, dated January 23, 1915, from Rose E. Preston and Lenard Preston, her husband (then owners thereof) to E. J. Hubler, in the principal amount of $400.00, bearing interest at 8% per annum from date, recorded in Book 41, Page 153 in the office of the county clerk of Delaware County, Oklahoma. Said mortgage purports to have been foreclosed by one Gus Hubler, but there is not recorded in said county any assignment of said mortgage to the said Gus Hubler.

\*    \*    \*    \*    \*    \*

"7. In order to induce plaintiffs to enter into the contract aforesaid (Exhibit A), defendants made the following representations to plaintiffs, each of which was believed and relied upon by plaintiffs, and each of which was false:

"(a) That a boat channel reached from Grand Lake to and upon the said 9.66 acre tract hereinabove mentioned.

"(b) That an island, a short distance offshore in Grand Lake, could be used by plaintiffs to build boat docks and other improvements to facilitate fishing.

"(c) That the difference between the high and low water marks of Grand Lake represented only about 25 to 30 feet on the ground horizontally.

"(d) That the irregular and shaded line on the map hereinabove referred to represented the high water shore line of Grand Lake.

"(e) That it would be feasible to build a boat dock reaching from that portion of the property where the cabins are located down to Grand Lake."

The defendants filed their answer denying the allegations of the complaint and counterclaimed for specific performance and for damages.

Upon the issues thus tendered, a trial was had, and the court, after hearing evidence, made and filed its findings of fact and conclusions of law, and entered its decree denying to plaintiffs the relief prayed for in the complaint; dismissed the action with prejudice and entered judgment for defendants on their cross-complaint. Thereafter plaintiffs filed a motion for a new trial which was denied and they prosecute this appeal.

Many errors are assigned which are argued under six points. However, we

believe that the decisive question on this appeal is, whether or not the plaintiffs by their actions and conduct ratified the exchange contract with full knowledge of all claimed defects, thereby waiving any right they might have had to rescind the same.

The evidence shows that the negotiations between the parties for the exchange of their respective properties continued some forty days before the trade was finally consummated; that Mr. Brown not only had full opportunity to, but did actually inspect the Oklahoma property; and had detailed information from his Oklahoma attorney regarding defendant's property before entering into said contract.

On May 18, 1951, Mr. Herman Merson, Brown's Oklahoma attorney, wrote him the following letter:

"Please be advised that I have examined Abstract of Title No. 5972 containing 65 entries, last certified to on the 7th day of May, 1951, at 7:00 o'clock A.M., by Jay Abstract Company, said certificate covering the period of time subsequent to December 14, 1950, at 7:00 A.M., and covering the following described real property situate in Delaware County, Oklahoma, to-wit:

"All that part of the NW½ of the NE¼ of the SE¼ lying South and East of the K. O. & G. right-of-way, and all that part of the NW¼ of the

SE¼ of Section 26, Township 25 North, Range 22 East, lying South and East of the K. O. & G. Railroad, less that part taken by the Grand River Dam Authority.

"I am of the opinion that title to said property was on said date vested in Caven L. Newton and Maurine A. Newton, husband and wife, as joint tenants, subject to the following:

"1. At Entry No. 60 appears a mortgage executed by James M. McClure and Geneva McClure, husband and wife, in favor of Robert R. Quinn and Lena M. Quinn, husband and wife, dated June 2, 1950, in the original sum of $8,500.00.

"This mortgage recites: 'It being understood that there is a 9-unit tourist court on this land, and they are numbered 1 to 9, and this mortgage covers all of the furniture and furnishings in units 1 to 7 inclusive.'

"2. At Entry No. 61 appears a mortgage executed by James M. McClure and Geneva McClure, husband and wife, in favor of T. C. Helm or Clara A. Helm, husband and wife, dated June 8, 1950, in the original sum of $950.00.

"*Requirement*: If you are purchasing this property free and clear of the above mortgages, releases must be obtained, recorded and abstracted. If

you are purchasing said property subject to the above mortgages, then you should be advised as to the present unpaid balances and your deed should except said mortgages from the warranty.

"3. The property owned by Caven L. Newton and Maurine A. Newton, husband and wife, was deeded to them as set forth in the above description. The abstract does not contain a survey showing the location of the railroad or of the property acquired by the Grand River Dam Authority.

"The abstract contains the following instruments which pertain to the property of the railroad and Grand River Day Authority, to-wit:

"(a) At ·Entry No. 47 appears a warranty deed executed by Thomas J. Foust and Vesper J. Fost in favor of the Grand River Dam Authority, a public corporation, dated January 20, 1939.

"(b) At Entry No. 48 appears a Grant for Railroad Right-of-way executed by Thomas J. Foust and Vesper J. Foust, his wife, in favor of Kansas, Oklahoma & Gulf Railway Company dated January 24, 1939.

"(c) At Entry No. 52 appears a Judgment on Declaration of Taking in Case No. 1178, United States of America, Petitioner, vs. Certain Parcels of lands in Delaware County, Oklahoma, containing approximately 41.82 acres, more or less, and Mesa Grande Yacht Club, et al, Defendants, in the United States District Court in and for the Northern District of Oklahoma. This Judgment was dated March 24, 1944 and filed March 30, 1944, at 3 P.M. The abstracter has abstracted this judgment in brief, but states that it was a judgment for a perpetual easement for flowage purposes.

"(d) At Entry No. 53, appears a Judgment on Declaration of Taking in Case No. 1076, United States of America, Petitioner, vs. Certain Parcels of Land in Delaware County, Oklahoma, containing approximately 124.0 acres, more or less, and Alta Foust, et al., in the United States District Court in and for the Northern District of Oklahoma. This judgment was dated September 3, 1943, and filed February 9, 1944, at 2:30 P.M. The abstracter has abstracted this judgment in brief, but states that it was a judgment for a perpetual easement for flowage purposes.

"A surveyor could ascertain the exact description covering the railroad right-of-way and the flowage easements.

"4. At Entry No. 49 appears an easement in favor of Public Service Company of Oklahoma, granting a per-

petual right, privilege and authority to erect, operate, and maintain a line of poles, wires and fixtures for the transmission of electric current and telephone and telegraph messages upon, over and across the following property: Along a line 32 feet East of the West line of the NW¼ of SE¼ of Section 26. The abstracter has also noted that the easement was for highline purposes.

"5. At Entry No. 7 appears a mortgage dated January 23, 1915, in favor of E. J. Hubler. At Entry No. 10 appear proceedings instituted by one Gus Hubler who alleged that said mortgage was assigned to him. However, his assignment of mortgage does not appear of record. The Court foreclosed said mortgage and the property was sold at Sheriff's sale."

Although the above opinion was not actually received by Mr. Brown until May 25, 1951, after he had taken possession of the Oklahoma property, the information contained therein was transmitted to him by phone the day before the exchange contract was entered into, and he knew all about the existing easements of which he now complains. He testified:

"Q. Were the things that he told you in conversation, in substance the same things that he mentioned, in his written opinion, Plaintiffs' Exhibit 'D'?

A. That is right. I think he was reading from this, because it sounded like the same things over the phone."

Any delay on the plaintiff's part, after receiving the information given them by their Oklahoma attorney regarding the title to the property in question, together with their remaining in possession thereof and treating it as their own, evidenced an intention on their part to abide by the exchange contract, and therefore forfeited any right to rescind the same. Their entire conduct from the time they took over said land up to and until they moved away therefrom shows that they were satisfied with the deal, and that, if they ever had a right to rescind the contract, they deprived themselves of their remedy by their acquiescence. In this connection the court found:

"4. Prior to entering into the contract, and on or about April 21, 1951, the Plaintiff, Clarence G. Brown, had *had* shown to him on the ground at the Oklahoma property, the extent to which the lake level rose, said extent being evidenced by a clearly defined drift line on the ground, and the Plaintiffs were thereafter fully apprised of the fact that a portion of the Oklahoma real estate intended to be conveyed by the Defendants to the Plaintiffs was subject to a factual condition of flowing or flooding.

"5. The drift line so visible on the ground approximates closing the extent

to which the Grand River Dam Authority holds flowage easements on the ground;

"6. On or about May 17, 1951, immediately prior to the signature and delivery of the contract of the parties, Exhibit A to the Complaint, the Plaintiffs were apprised by their attorneys of the flowage easements which affected part of the Oklahoma real estate which was to be conveyed by the Defendants to the Plaintiffs, and with this information, the Plaintiffs intentionally entered into the contract with full knowledge that a portion of the real estate described in the contract was subject to flowage easements which could not be removed.

"7. On or about the 25th day of May, 1951, the Plaintiffs actually saw the written opinion of their Oklahoma counsel describing in detail the flowage easements to which the property in Oklahoma was subject, and referring specifically to the claimed defect in title to the Oklahoma property described in paragraph 5d of the Complaint, and with full knowledge of the same elected to proceed with the performance of the contract of the parties.

"8. The Plaintiffs went into possession of the premises to be conveyed by the Defendants to the Plaintiffs, on or about the 20th day of May, 1951, and thereafter at all times, with full knowledge of the claimed defects in title to said real estate referred to in the Complaint, elected to waive said claimed defects, and acted continuously in a manner indicating a specific intention to treat said contract as in force and effect, and to waive any breach thereof."

Based upon the above findings the court concluded:

"3. The Plaintiffs have ratified the contract of the parties, Exhibit A of the Complaint, with full knowledge of all of the facts which they now assign as a claimed breach of said contract, and have waived any breach thereof."

It is unnecessary for us to quote the evidence, suffice it to say that we have carefully examined the record and conclude that there is sufficient evidence of a substantial nature to support the findings made by the court and the conclusions of law based thereon. Therefore, they will not be disturbed by us. Citations to support this elementary proposition are unnecessary.

We are of opinion, and so hold, that under the circumstances in the instant case, the contract was ratified expressly as well as by conduct. Armijo v. Nuchols, 57 N.M. 30, 253 P.2d 317.

The case of Agnew v. Landers, not yet officially reported, relied on by plaintiffs to support their contention is not in point nor controlling in this case. The factual situa-

tion as well as the conduct of the parties in that case were entirely different from what we have in the case at bar.

Plaintiffs also contend that the court erred in awarding damages to defendants in the manner it did and that the defendants should have mitigated the damages.

■ The position of the plaintiffs seems to us to be untenable. The very purpose of allowing damages for breach of contract is to restore to the injured party whatever he has lost by the breach, and all that he, in reasonable probability, would have gained had there been no breach. Miller v. Robertson, 266 U.S. 243, 45 S.Ct. 73, 69 L.Ed. 265.

■ It is well settled, when there has been a delay in the completion of a building or performance of the work, there being no extension of the time or waiver, the rental value of the premises is the true measure of damages. Price v. Van Lint, 46 N.M. 58, 120 P.2d 611. Evidence was given tending to show that the cost of completing the construction of the triplex was $1,850 and that the rental loss of the plaintiffs, by reason of their inability for a period of twenty four months to occupy the premises, amounted to $5,400 or $225 for each month's delay.

In Warren v. Stoddart, 105 U.S. 224, 26 L.Ed. 1117, the rule regarding mitigation of damages is stated as follows:

"Where a party is entitled to the benefit of a contract, and can save himself from a loss arising from a breach of it at a trifling expense or with reasonable exertions, it is his duty to do it, and he can charge the delinquent with such damages only as with reasonable endeavors and expense he could not prevent."

■ But in the case at bar the defendants had no control of the premises because the plaintiffs had a receiver appointed over their objection, nine days after suit was filed, to take exclusive possession of and to operate the premises, and thereby, under such circumstances, prevented any mitigation of damages by defendants. 17 C.J. 767, § 96; 25 C.J.S., Damages, § 33. Other propositions are raised and argued under this point but we find them without merit.

Other errors are assigned and argued but in view of the conclusions reached we find it unnecessary to determine them. The appellees also suggest in the closing part of their brief that the damages awarded are too low, especially as to loss of rentals, but the assertion was not reserved below and has no place here.

It follows from what has been said that the judgment should be affirmed with costs and the cause remanded to the District Court to render judgment against the sureties on the supersedeas bond.

It is so ordered.

COMPTON, C. J., and SADLER, McGHEE and KIKER, JJ., concur.