2003-NMCA-124

83 P.3d 288

**Toby ROMERO, Plaintiff–Appellee,**

v.

**The BANK OF THE SOUTHWEST, a State Chartered Financial Institution, Defendant–Appellant.**

**No. 22,635.**

Court of Appeals of New Mexico.

Aug. 20, 2003.

Gordon H. Rowe, III, The Rowe Law Firm, P.C., Albuquerque, NM, for Appellee.

Jane Bloom Yohalem, Santa Fe, NM, for Appellant.

*OPINION*

BUSTAMANTE, Judge.

{1} Defendant Bank of the Southwest (the Bank) appeals from a judgment in favor of Plaintiff Toby Romero (Toby) in the amount of $53,662.51. The district court decided that the Bank compelled Toby, by duress, to allow it to divert the proceeds of a land sale from payment of a mortgage note owed by Toby and his cousin Kenneth Romero (Kenny), as co-obligors, to debts owed the Bank by Wes-tar Metals, Inc. (Westar). Westar was a corporation wholly owned by Kenny.

{2} The Bank appeals the district court's decision on two grounds: (1) Toby ratified the diversion as a matter of law, and even if he did not ratify the agreement; (2) Toby suffered no damages as a result of the Bank's actions. We find that there was substantial evidence in the record to support the district court's finding that there was no ratification. Moreover, we hold that the judgment constituted an award of restitution. Therefore, the Bank was not entitled to reduce its liability, as a matter of law or equity, by any compensation Toby may have received from other sources. Accordingly, we affirm.

{3} Toby filed a notice of cross-appeal, but did not file a timely docketing statement. We denied a motion to extend the time for filing the docketing statement and now deny the motion to reconsider. The cross-appeal is dismissed.

**FACTS AND PROCEEDINGS**

{4} This case involves a series of transactions between the Bank, Toby, and Kenny, as well as several collateral transactions between Toby and Kenny and other parties. On October 19, 1994, Toby and Kenny, as co-obligors, borrowed $172,500 from the Bank. They used the loan proceeds, along with approximately $50,000 of their own money, to purchase three parcels of land from the Atchison, Topeka & Santa Fe Railroad (Railroad). The three parcels included 238.57 acres in Valencia County, 158.50 acres in Sierra County, and 26.3 acres in Chaves County (the Roswell Property). The loan (Loan No. 2455) was due to mature on October 19, 1995, and was secured by a first mortgage in favor of the Bank against each of the three parcels. The loan was not otherwise guaranteed or cross-collateralized by Toby and Kenny. Toby and Kenny owned the property as tenants in common and were jointly and severally liable on the loan. At the end of one year, Toby and Kenny executed a new note for $170,614.61, though the Bank used the same loan number (Loan No. 2455), and essentially rewrote the previous loan simply extending the due date to October 18, 1996. Between October 1995 and

June 1996 payments were timely made as required under the note.

{5} After Toby and Kenny purchased the three properties, they terminated a lease held by the Roswell Livestock Auction, (the Auction) which encompassed approximately half of the Roswell Property. As a result of the lease termination, the Auction's owners (the Wootens) filed a lawsuit against Toby and Kenny and the Railroad. A global settlement agreement was reached in May 1996 in which Toby and Kenny agreed to sell the Auction property for $111,500 to the Wootens, and the Railroad agreed to sell 8800 tons of rail to Toby and Kenny at a discounted price of $92 per ton. The Bank agreed to execute a partial release of the mortgage covering the Auction property in exchange for the net proceeds from the sale which would be used to pay down Loan No. 2455.

{6} Closing on the Auction property sale was set for June 5, 1996. Prior to closing, the title company prepared a closing statement reflecting that the net proceeds of the sale, $108,837.07, would be applied to Loan No. 2455. However, contrary to its prior agreement and without Toby's approval, the Bank instructed the title company to change the closing statement to reflect that $53,662.51 of the net proceeds would be applied to pay off two notes owed to it by Westar and only $55,174.56 would be applied to Loan No. 2455.

{7} After initially making Loan No. 2455, the Bank loaned Westar money under two notes totaling $53,662.51: loan number 2295 ($25,123.26), and loan number 4362 ($28,539.25). Both loans were guaranteed by Kenny. Toby had no ownership or financial interest in Westar and he was not obligated in any manner on the Westar loans. The collateral for the Westar loans did not include the three parcels of land which secured Loan No. 2455.

{8} Toby testified that the first time he became aware of the diversion was at closing. The district court found that Toby did not want to pay off the Westar notes with the proceeds from the sale, but he signed the closing statement because he believed he had no choice to do otherwise without jeopardizing the settlement. The Bank was not pres-

ent at the closing. The district court also found that the Wootens, who were present, were unhappy about having to buy the property but were prepared to sign; and Toby had already paid $30,000 in attorney fees on the lawsuit. Toby opted to sign the statement and "deal with the Bank at a later time." Toby complained to a Bank officer about the diversion of proceeds to pay off the Westar notes in July 1996, but the Bank refused to reallocate the funds.

{9} On August 5, 1996, Toby and Kenny signed another note to the Bank in the amount of $306,121. The purported purpose of the loan was to buy the rail from the Railroad under the terms of the settlement agreement and, in turn, to facilitate a contract they had entered into prior to closing to resell the rail to the Kovalchick Corporation (Kovalchick) at a substantial profit. Instead, the loan money was used to purchase stock in the Bank. Kovalchick paid off the note a couple of months later, in partial payment of the rail.

{10} On November 29, 1996, Toby and Kenny executed another written modification agreement of Loan No. 2455, which had matured, extending the due date to November 29, 1997. Toby again objected to the diversion of funds at the June 5, 1996, closing, and once again the Bank refused to change the balance. Approximately two weeks later, on December 16, 1997, Toby requested that a Bank officer calculate the balance due on Loan No. 2455, in order to determine the amount he would owe the Bank if Kenny paid his full share and the entire proceeds from the Wooten sale had been credited to the note at the June 1996 closing. The Bank officer prepared a written memorandum reflecting a $26,784.43 balance, which Toby then paid in full.

{11} The Bank sent Toby a letter demanding payment on the "total unpaid principal balance of $73,506.01 plus unpaid accrued interest ... of $465.20" on Loan No. 2455 on January 7, 1998. Toby was forced to pay off the loan because by then Kenny was financially insolvent. Another bank agreed to loan Toby the money, using the same property as collateral, only if Kenny "was signed off

the property." Kenny deeded his interest in the three parcels to Toby and Toby borrowed approximately $92,000 to pay off the $73,000 balance on Loan No. 2455 and a $19,000 tax lien on the property, which had been filed against Kenny. Toby admitted he did not pay anything to Kenny for his interest.

{12} Toby filed a complaint on December 30, 1999, alleging conversion and unjust enrichment. The complaint was amended twice adding claims for failure of consideration and duress, breach of the covenant of good faith and fair dealing, and prima facie tort. A bench trial was held on July 2, 2001, proposed findings and conclusions were submitted by both parties, and the district court filed a letter decision on July 18, 2001. Judgment was entered by the district court against the Bank in the amount of $53,662.51. The Bank filed a Motion for Reconsideration, requesting the district court to amend its decision to reflect the evidence showing Toby was fully compensated by Kenny and therefore suffered no damages. The motion was denied, and this appeal followed. In response to an Order For Limited Remand issued by this Court, the district court filed restated findings and conclusions, along with an Amended Judgment.

{13} The district court found that Toby only agreed to divert the Auction sale proceeds to pay off the Westar notes under duress. In the district court's own words, "[t]he conduct of the Bank's officer in directing the title company to pay off the Westar notes was tantamount to telling Toby Romero: 'If you don't pay off your cousin's (Westar's) debt, we won't release our mortgage. Without a release of our mortgage, you can't settle your law suit.'" The district court further found the Bank improperly "received an obvious benefit from the diversion of funds" and ordered the Bank to pay damages in the amount of $53,662.51. Toby's request for punitive damages was denied.

## I. Ratification

{14} On appeal, the Bank concedes it applied duress to force Toby to divert proceeds from the Auction property sale to pay off the Westar notes. Nonetheless, the Bank contends that in the months following the June 5, 1996 closing, Toby, with full knowledge of the material facts and without continuing duress, acted to ratify the terms of the closing agreement. In its brief, the Bank sets forth what it asserts are undisputed facts, including the documentary evidence introduced at trial and Toby's testimony, satisfying each of the elements of ratification. Having laid out the factual predicate for each element, the Bank asks this Court to find ratification as a matter of law.

{15} Toby counters that the Bank's arguments on appeal are much more elaborate than its arguments below. He correctly points out that the Bank's only argument below was that Toby ratified the terms of the closing agreement when he signed the November 1996 modification agreement to extend the due date of Loan No. 2455, thereby implicitly acknowledging he owed the remaining balance, despite the diversion of funds to the Westar notes. The Bank requested this specific finding and the district court rejected it. Having failed to request specific findings on the remaining issues, Toby argues the Bank failed to preserve the issue.

{16} We find the Bank preserved the ratification issue, although we do so with some reservation. Preservation turns on whether the district court and opposing party were sufficiently alerted to the question. *See* Rule 12–216(A) NMRA 2003; *see also Garcia ex rel. Garcia v. La Farge*, 119 N.M. 532, 540, 893 P.2d 428, 436 (1995). In our view the Bank just meets the test. A review of the record shows that in its closing argument, the Bank cited to *Armijo v. Nuchols*, 57 N.M. 30, 253 P.2d 317 (1953), an early decision examining the elements of ratification. The Court in *Armijo* held that the plaintiff, with full knowledge of the facts entitling him to rescind a voidable contract, ratified the contract, without fraud or duress, by expressly and implicitly confirming the contract in a supplemental agreement and by waiting a month to rescind it. *Id.* at 35–36, 253 P.2d at 320–21. Although the only evidence the Bank cited to establish ratification was the November 1996 modification agreement, both the district court and Toby were aware that the ratification argument was on

the table, as well as the elements required to establish the defense. There was undisputed evidence that despite Toby's objection to the diversion, he continued to do business with the Bank after the June closing. Although the Bank could have elaborated as to why the duress was removed and how Toby further ratified the diversion of funds, we do not find its argument on appeal unfair.

{17} We turn next to the appropriate standard of review. The Bank urges a de novo review, arguing that the district court misapplied the law of ratification to the undisputed facts. In contrast, Toby argues that the question of ratification is a question of fact which should be reviewed for substantial evidence. We believe ratification is best reviewed as an issue of fact. *See* 25 Am. Jur.2d *Duress and Undue Influence* § 25 (1996). The district court found Toby did not ratify the closing agreement. *See Landskroner v. McClure*, 107 N.M. 773, 775, 765 P.2d 189, 191 (1988) (failure of trial court to make finding of fact is regarded as finding against the party seeking to establish the affirmative); *Griffin v. Guadalupe Med. Ctr., Inc.*, 1997–NMCA–012, ¶ 22, 123 N.M. 60, 933 P.2d 859 ("When the trial court's findings of fact are supported by substantial evidence, . . . refusal to make contrary findings is not error."). We, therefore, review the district court's finding for substantial evidence.

{18} The substantial evidence standard requires that we review the record and all reasonable inferences therefrom in a light most favorable to the district court's decision. *Hourigan v. Cassidy*, 2001–NMCA–085, ¶ 17, 131 N.M. 141, 33 P.3d 891. Our objective is not to determine whether substantial evidence supports an opposite result, but whether there is substantial evidence to support the decision of the lower court. *Id.; Las Cruces Prof'l Fire Fighters v. City of Las Cruces*, 1997–NMCA–044, ¶ 12, 123 N.M. 329, 940 P.2d 177. The issue before us is whether there is substantial evidence supporting the district court's finding that Toby did not ratify the diversion of funds, bearing in mind that the Bank had the burden to prove ratification. *See Kimberly, Inc. v. Hays*, 88 N.M. 140, 143, 537 P.2d 1402, 1405 (1975) (stating that burden of proving affirmative defense

rests on defendant); *Mosley v. Magnolia Petroleum Co.*, 45 N.M. 230, 255, 114 P.2d 740, 756 (1941) (recognizing defendant bore burden to prove ratification).

{19} Any contract entered into under duress is voidable and subject to rescission. *See Dunn v. Hite*, 27 N.M. 53, 57–58, 195 P. 1078, 1079–80 (1921); *Terrel v. Duke City Lumber Co.*, 86 N.M. 405, 430, 524 P.2d 1021, 1046 (Ct.App.1974), *aff'd in part and rev'd in part on other grounds* 88 N.M. 299, 540 P.2d 229 (1975). The Bank is correct to state that, under our law, Toby could lose his right of rescission, if he ratified the contract. Ratification is effective only if (1) all duress is removed; (2) the wronged party has full knowledge of all the material facts entitling him to rescission; and (3) he manifests an intent to ratify the contract, either expressly or by conduct. *See Armijo*, 57 N.M. at 35, 253 P.2d at 320; *Dunn*, 27 N.M. at 58, 195 P. at 1079.

{20} As noted above, the only finding proposed by the Bank on the ratification issue cited the November modification of Loan No. 2455. On appeal, the Bank argues that this evidence, together with the August 1996 loan for $306,000, showed Toby treated Loan No. 2455 as an on-going obligation. Despite this new argument, we conclude it was reasonable for the district court to find Toby did not intend to ratify the closing statement, either expressly or implicitly through his conduct. The undisputed evidence shows that Toby expressly disaffirmed the diversion of funds. Toby's complaints to the Bank about the misapplication fell on deaf ears.

{21} Further, it is reasonable to infer that extending the due date of Loan No. 2455, even though it reflected a higher balance than Toby agreed to pay, was not inconsistent with avoidance. Although Toby may have had other "pokers in the fire," there was no evidence, as the Bank suggests, that any of his other investments had come to fruition or that he was in a position to pay off the note or obtain other financing at that time. A party does not manifest an intent to affirm a contract where "he continues to perform [under the contract] only for the

purpose of preserving what he has already invested in the performance." Restatement (First) of Restitution § 68 cmt. b (1937). Here, Toby had invested in three parcels of real estate and if he did not pay off or renew the note, he risked foreclosure. In addition, the fact Toby obtained other financing for other projects is not enough to establish as a matter of law an intent to ratify the fund diversion. The $306,000 note was a separate business transaction, wholly unrelated to the diversion of funds and only indirectly related to Loan No. 2455 in that it was ostensibly prompted by the settlement of the lawsuit with the Wootens and the Railroad.

{22} In addition, the record supports an inference that the duress was never completely removed. The Bank notes that Toby did not claim the duress continued after closing. This argument is not helpful to the Bank because it was the Bank's burden to prove the duress ceased to exist at closing, not Toby's burden to show duress continued.

{23} Although the Bank never requested a specific finding on the issue, the Bank now asserts that the only evidence of duress the district court found occurred at closing. The Bank speculates that Toby and Kenny were not under continuing duress because they were not dependant on the Bank for their business needs and could have easily borrowed money elsewhere to pay off the note. It is undisputed that Toby had no practical alternative to signing the closing statement because without the mortgage release he could not settle the lawsuit. Toby could not disaffirm the diversion of funds and thereby undo the settlement without suffering significant financial consequences. *Armijo*, 57 N.M. at 35–36, 253 P.2d at 321 (stating "party entitled to relief may either avoid the transaction or confirm it, he cannot do both; if he adopts a part, he adopts all; he must reject it entirely if he desires to obtain relief") (internal citation and quotation marks omitted). It would also be reasonable to infer that the pervasive threat of severe financial consequences resulting from a broken settlement agreement remained after closing. *See Terrel*, 86 N.M. at 430–31, 524 P.2d at 1046–47 (finding pervasive threat remained after initial duress applied by defendant

ceased because party was financially dependant on defendant to meet its daily business needs). Further, Toby could not escape the effects of the duress absent cooperation from the Bank. For example, refinancing Loan No. 2455 with another bank would only cement his loss.

{24} Accordingly, we find there was substantial evidence to support the district court's finding that Toby did not manifest an intent to ratify the closing agreement. The undisputed evidence showed Toby disaffirmed the diversion of funds but was unable to do anything about it without jeopardizing his settlement agreement and exposing himself to significant financial consequences. Having found evidence to support the district court's decision against ratification, we can not say that Toby ratified the diversion as a matter of law.

## II. Damages

{25} The district court entered the following findings of fact on Toby's claim of unjust enrichment:

13. The Bank had no instructions, written or oral, to divert $53,662.51 of the proceeds of sale of the Roswell Livestock Auction property to Westar Metals Inc. and failed to satisfactorily explain why the funds belong[ing] to both Toby Romero and Kenny Romero were diverted in a manner whereby Toby Romero received no benefit.

14. The Bank received an obvious benefit from the diversion of funds: First, the Westar notes were less secure than the Romero note. Westar Metals Inc. was not in good financial conditions [sic] in 1996. Secondly, neither of the two Westar notes was collateralized by real estate as was the Romero note. The Bank's purpose in diverting the funds was to "clean-up" the Westar notes.

. . .

21. Upon demand by the Bank, Toby Romero was forced to pay off the Romeros' mortgage note in an amount of more than $73,000 because he was jointly and [severally] liable for the debt and because Kenny Romero was insolvent.

22. Had the Bank not diverted the proceeds of the Roswell Livestock Auction

sale to pay the Westar Metals Inc. notes, the amount of Toby Romero's liability because of Kenny Romero's insolvency would have been reduced by $53,662.51 (the amount which the Bank should have paid on the Romeros' mortgage note but diverted to the Westar notes).

{26} The Bank argues Toby was not entitled to an award of damages or restitution, as a matter of law or equity. The Bank acknowledges that Toby paid off Kenny's share of the balance on Loan No. 2455. However, the Bank points out that at the new lender's request, Kenny deeded his interest in the Roswell Property to Toby to serve as collateral for the new loan. The Bank argues that since Toby paid nothing for Kenny's share and since he testified that the value of the Roswell Property, prior to the Wooten sale, was $400,000, Kenny's interest in the remaining acreage was $100,000, which more than compensated Toby for any damages. The Bank also contends it was not unjustly enriched because the $53,662.51 was money it was legitimately owed. Finally, the Bank argues that, as a matter of equitable balancing, it should not be required to pay restitution. In its view, Toby will be doubly compensated, even though he had unclean hands in the deal because he misled the Bank about the purpose of the $306,000 loan, whereas the Bank only collected money it was legitimately owed.

{27} Toby responds that he paid $226,162.51 on a $172,500 note, and thus the Bank has been unjustly enriched. Toby disputes the Bank's assertion that he made money off Kenny or was otherwise compensated, asserting that, in fact, he lost money when his cousin became insolvent. In any event, profitable business dealings outside of the transaction at issue, according to Toby, should not excuse the Bank from paying restitution for its wrongful conduct in unrelated matters.

{28} The Bank argues that the district court misapplied the law to the facts and requests a de novo review of the issue concerning damages and restitution. In contrast, Toby argues that an abuse of discretion standard should be applied to the district court's equitable decision to award restitution for unjust enrichment. We have recently refined our standard of review in cases such as this. "The question of whether, on a particular set of facts, the district court is permitted to exercise its equitable powers is a question of law, while the issue of how the district court uses its equitable powers to provide an appropriate remedy is reviewed only for abuse of discretion." *United Props., Ltd. v. Walgreen Props., Inc.*, 2003–NMCA–140, ¶ 7, 134 N.M. 725, 82 P.3d 535 (2003); *see also Amkco, Co. v. Welborn*, 2001–NMSC–012, ¶¶ 8–9, 130 N.M. 155, 21 P.3d 24 (treating the question of the showing necessary to obtain injunction concerning an encroachment and the showing necessary to establish irreparable injury as issues of law and reviewing the district court's balancing of the equities under an abuse of discretion standard).

{29} The Bank's argument is a twist on the idea of mitigation of damages. *See* UJI 13–860 and 13–1820 NMRA 2003. The Bank posits that Toby successfully mitigated and it deserves the credit. We note that the Bank has cited no authority, and we have found none, to support its proposition that it is entitled to a credit as a matter of law, if in fact Toby profited from his receipt of Kenny's half of the property. The Bank apparently simply assumes that the principles of mitigation and avoidable consequences apply to cases involving restitution of benefits gained through duress. We do not need to decide the issue in this case, but for purposes of discussion, we accept the Bank's assumption. We do note that mitigation will probably arise infrequently in the context of duress. It will be the rare case where, as here, a third party will be involved who arguably benefits from an exercise of duress and to whom a plaintiff could theoretically look for relief from the effects of the duress. Most cases involve only the victim and perpetrator of the duress. Relying on general principles underlying the doctrines of duress and restitution, we conclude the district court did not err in refusing the credit.

{30} Duress is an intentional wrong. UJI 13–838 NMRA 2003. " 'The rationale of the doctrine [of duress] is to discourage or prevent an individual in a stronger position,

usually economic, from abusing that power by presenting an unreasonable choice of alternatives to another person in a weaker or more vulnerable position, in a bargain[ing] situation.'" *First Nat'l Bank v. Sanchez*, 112 N.M. 317, 320, 815 P.2d 613, 616 (1991) (quoting *Terrel*, 86 N.M. at 422, 524 P.2d at 1038). Utilizing a tort analysis, we have held that a plaintiff may recover all damages proximately caused by duress. *Terrel*, 86 N.M. at 424, 524 P.2d at 1040. However, our Supreme Court has noted that the primary objective of the doctrine is to prevent unjust enrichment and the normal remedy for duress is restitution. *See First Nat'l Bank*, 112 N.M. at 321, 815 P.2d at 617; *see also Cent. Sec. & Alarm Co. v. Mehler*, 1996–NMCA–060, ¶ 19, 121 N.M. 840, 918 P.2d 1340 (recognizing principle of compensatory damages is to place plaintiff in as good a position as before if there had been no breach).

■■■■■■ {31} Restitution is measured by the benefit realized by the defendant. *Id.* ¶ 12; *see* Restatement (Second) of Contracts § 371 (1981); Dan B. Dobbs, *Dobbs Law of Remedies*, § 4.1(1), at 551 (2d ed.1993). "[Its] purpose is to prevent the defendant's unjust enrichment by recapturing the gains the defendant secured in a transaction." Dobbs, *supra* at 552. Typically, where the defendant has received money from plaintiff, the amount of restitution owed is equal to the amount of money paid. Restatement (Second) of Contracts, *supra* cmt. a; Dobbs, *supra* § 4.5(2), at 630–31. In this regard, restitution traditionally seeks to restore the status quo, returning both parties to the position they were in before the injury. *See also Ledbetter v. Webb*, 103 N.M. 597, 600, 711 P.2d 874, 877 (1985) (stating restitution is equitable remedy designed to restore the status quo ante).

■■■ {32} Generally, three subsequent types of events have been recognized which may reduce an award of restitution:

(1) The defendant passes the benefit on to someone with a better claim to it. (2) The defendant consumes the benefit so that it is no longer reflected in assets. (3) The defendant received the benefit, but in connection with the same transaction suffers damages, so that in a sense his net benefit is less the amount he received.

Dobbs, *supra* § 4.5(4), at 652. In each case, the amount of restitution is measured by the benefit to the defendant, not as the Bank argues here, by the plaintiff's profit. In any event, none of these three scenarios are applicable to the instant case.

■■■ {33} In light of the foregoing, we cannot agree that even if Toby actually profited from his transactions with Kenny, the Bank is entitled to a reduction in liability as a matter of law. Given the intentional nature of the wrong and the nature of the remedy, we believe something more than bare profit from another transaction is necessary for mitigation to be applied in favor of one guilty of duress. Here, at the least there would have to be a specific finding that Toby and Kenny intended the transactions to compensate Toby for his payments to the Bank to make the Bank's claim colorable. The Bank cannot escape the consequence of the district court's specific refusal of the Bank's request to find as a matter of fact that Kenny deeded his interest in the properties "in exchange for the Plaintiff refinancing and paying the remaining obligation on loan number 2455 that included the amounts previously used to pay the two Westar Metals loans at the closing of the sale of the property to the Wootens on June 5, 1996."

■■■ {34} We are also unpersuaded by the Bank's second argument that it was not unjustly enriched. Unjust enrichment exists when one party knowingly benefits at another's expense and allowing that party to retain the benefit would be unjust. *Credit Inst. v. Veterinary Nutrition Corp.*, 2003–NMCA–010, ¶ 21, 133 N.M. 248, 62 P.3d 339; *Ontiveros Insulation Co. v. Sanchez*, 2000–NMCA–051, ¶ 11, 129 N.M. 200, 3 P.3d 695. The Bank does not dispute the district court's findings that Toby paid the Westar notes owed by Kenny without receiving any benefit, whereas the Bank benefitted by "cleaning up" notes that were less secure and owed by a company that was financially weak at the time. Nonetheless, the Bank reasons that Toby is only lawfully entitled to restitution on amounts paid in excess of debts actually owed. Since it received only money that it

was legitimately owed on the Westar notes and because Kenny fully compensated Toby for his payment on the notes, there is no unjust enrichment.

{35} To arrive at this result, the Bank misapplies the broad rule followed by some courts that a plaintiff is entitled to recover only the excess over what is reasonably and justly due. John P. Dawson, *Economic Duress–An Essay In Perspective*, 45 Mich. L.Rev. 253, 283 (1947). Dawson clearly states, this rule applies to a "relatively small percentage of the cases" where *plaintiff owed the debt* in question but defendant was overpaid. *Id.* As stated above, Toby was not obligated to pay the debt and the Bank was not lawfully entitled to recover the money from him in satisfaction of it. *See generally Bettini v. City of Las Cruces*, 82 N.M. 633, 485 P.2d 967 (1971). Unjust enrichment at one party's expense is not extinguished simply because a defendant is lawfully entitled to recover money from another.

{36} As a last resort, the Bank urges us to weigh the equities. It complains that Toby did not come to the "deal" with clean hands but misled the Bank in a "related transaction." In light of this fact, the Bank argues, it would be unfair to allow Toby to be doubly compensated, especially since the Bank received only the money it was owed. This argument relies on the same flawed premises discussed above but interjects a new theory that Toby is barred from relief as a matter of equity.

{37} A fundamental principle of equity is the frequently stated maxim that "he who comes into equity must come with clean hands." *Danley v. City of Alamogordo*, 91 N.M. 520, 522, 577 P.2d 418, 420 (1978) (internal quotation marks and citation omitted); 27A Am.Jur.2d *Equity* § 126 (1996). The decision of whether or not the facts and circumstances warrant the application of this doctrine rests within the sound discretion of the district court. *Granado v. Granado*, 107 N.M. 456, 459, 760 P.2d 148, 151 (1988); *Home Sav. & Loan Ass'n v. Bates*, 76 N.M. 660, 662, 417 P.2d 798, 799 (1966). In arriving at a decision to award full restitution, the district court apparently decided that Toby's misrepresentations about why he wanted the

August $306,000 loan did not materially affect the restitution claim. We find this determination was reasonable under the facts of this case.

{38} The district court found, and the Bank concedes, that it forced Toby to pay off the Westar notes by duress. Toby's conduct in his other business dealings with the Bank is not relevant to this inquiry. "[O]rdinarily, the wrong which may be invoked to defeat a suit under the clean-hands maxim must have an immediate and necessary relation to the equity which the complainant seeks to enforce against the defendant." 27A Am.Jur.2d *Equity* § 133. In other words, "the test ... is whether [the complainant] dirtied them in acquiring the right he now asserts." *Sanchez v. Saylor*, 2000–NMCA–099, ¶ 88, 129 N.M. 742, 13 P.3d 960 (internal quotation marks and citation omitted); *Mechem v. City of Santa Fe*, 96 N.M. 668, 670, 634 P.2d 690, 692 (1981). Any subsequent wrongdoing by Toby with regard to the $306,000 loan is irrelevant to his claim of duress which arose out of the diversion of funds from the sale of property secured by Loan No. 2455. *See id.* at 671, 634 P.2d at 693. The district court did not abuse its discretion in denying the Bank equitable relief from the judgment.

## CONCLUSION

{39} We affirm the district court.

{40} **IT IS SO ORDERED.**

WE CONCUR: LYNN PICKARD and RODERICK T. KENNEDY, Judges.